## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JENNIFER R. LARD, JOHN G. JUERGENS, GERALD L. ROBINSON, SCOTT W. ANDERSON, THOMAS A. PITERA, SHARON BRADLEY-SMITH and TORANZ J. PLUMMER, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) ) ) | **CIVIL ACTION NO.: 1:22-cv-4332** |
| Plaintiffs, | ) ) | **Honorable John R. Blakey** |
| v. | ) ) | |
| MARMON HOLDINGS, INC., THE BOARD OF DIRECTORS OF MARMON HOLDINGS, INC., MARMON RETIREMENT ADMINISTRATIVE COMMITTEE and JOHN DOES 1-30, | ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## FIRST AMENDED CLASS ACTION COMPLAINT[1]

Plaintiffs, Jennifer R. Lard, John G. Juergens, Gerald L. Robinson, Scott W. Anderson, Thomas A. Pitera, Sharon Bradley-Smith and Toranz J. Plummer, ("Plaintiffs"), by and through their attorneys, on behalf of Marmon Employees' Retirement Plan ("Plan"),[2] themselves and all others similarly situated, state and allege as follows:

## I.    INTRODUCTION

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Marmon Holdings, Inc.,  ("Marmon" or "Company"), the Board

---

[1]  Plaintiffs file this Amended Complaint pursuant to FED. R. CIV. P. 15(a)(1)(B).

[2]  The Plans are legal entities that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plans are not a party.  Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plans and their participants.

of Directors of Marmon Holdings, Inc.,  and its members during the Class Period[3] ("Board"), and the Marmon Retirement Administrative Committee and its members during the Class Period ("Committee") for breaches of their fiduciary duties.

2.    To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries.  Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009).  Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope.  29 U.S.C. § 1104(a)(1)(B).

3.    The Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices."  *See*, "*A Look at 401(k) Plan Fees*," *supra*, at n.3; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (*Tibble I*) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

4.    Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options.  "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), § 7.

---

[3] The Class Period, as will be discussed in more detail below, is defined as August 16, 2016 through the date of judgment.

5.      "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'"  *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[4]

6.      Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time."  *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

7.      The Supreme Court recently reiterated that interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones.  *Hughes v. Northwestern Univ.*, 2022 WL 19935, at *3 (2022).

8.       Most participants in defined contribution plans like 401(k) or 403(b) plans expect that their accounts will be their principal source of income after retirement.  Although at all times plan accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices by plan sponsors and fiduciaries, whether due to poor performance, high fees or both.

---

[4] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

9.    Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their retirement plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low-cost investment options are being made available to plan participants.

10.    At all times during the Class Period, the Plan had at least $870 million dollars in assets under management and 10,000 participants with account balances. At the end of 2020 and 2019, the Plan had over $1.1 billion dollars and $1 billion dollars, respectively, in assets under management that were/are entrusted to the care of the Plan's fiduciaries. The December 31, 2020 Report of Independent Auditor of the Marmon Employees' Retirement Plan ("2020 Auditor Report") at 3.

11.    The Plan's assets under management qualifies it as a large plan in the defined contribution plan marketplace, and among the largest plans in the United States. Indeed, the Plan's assets placed it in the top 0.2% of all 401(k) plans by plan size.[5] As a large plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments. Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure they were prudent.

12.    Plaintiffs allege that during the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; and (2) maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs

---

[5] The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2018 (pub. July 2021).

and/or better performance histories; and (3) failing to control the Plan's administrative and recordkeeping ("RKA") costs.

13. Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

14. Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II. JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

16. This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

17. Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III. PARTIES

### **Plaintiffs**

18. Plaintiff, Jennifer R. Lard ("Lard"), resides in Meridian, Mississippi. During her employment, Plaintiff Lard participated in the Plan investing in the options offered by the Plan

and was subject to the excessive RKA costs alleged below. Plaintiff Lard suffered injury to her Plan account by overpaying for her share of RKA costs. Plaintiff Lard specifically invested in the Target Retirement 2040 Fund complained of below. She suffered further injury to her Plan account from the underperformance and excessive expense of this fund. In addition, Plaintiff Lard suffered injury to her Plan account by having to pay for her share of consulting fees to maintain any of the lower performing or expensive funds in the Plan whether specifically identified herein or not, as described below. These funds were maintained and monitored with the assistance of Mercer Consulting who received at least $186,535 during 2020, the cost of which was borne by each participant in the Plan. Further, Plaintiff Lard suffered injury to her Plan account by the fact that her claim against her share of investments in the Plan is diminished by the high recordkeeping and underperforming funds which were left languishing in the Plan whether they are specifically identified herein or not. Under IRS regulations, a participant in any retirement plan regulated by ERISA, always maintains a claim in the form of an undivided interest against a plan's trust for his or her share of the investment. *See*, 26 CFR § 1.414(I)-1. The amount of this undivided interest is diminished for all participants when a Plan is paying excessive fees and maintains expensive and/or underperforming funds, as alleged below. *Id*.

19.    Plaintiff, John J. Juergens ("Juergens"), resides in Geneva, Illinois. During his employment, Plaintiff Juergens participated in the Plan investing in the options offered by the Plan and was subject to the excessive RKA costs alleged below. Plaintiff Juergens suffered injury to his Plan account by overpaying for his share of RKA costs. Plaintiff Juergens specifically invested in the Target Retirement 2040 Fund complained of, below. He suffered further injury to his Plan account from the underperformance and excessive expense of this fund. In addition, Plaintiff Juergens suffered injury to his Plan account by having to pay for his share of consulting fees to maintain any of the lower performing or expensive funds in the Plan whether specifically identified herein or not, as described below. These funds were maintained and monitored with the assistance

6

of Mercer Consulting who received at least $186,535 during 2020, the cost of which was borne by each participant in the Plan. Further, Plaintiff Juergens suffered injury to his Plan account by the fact that his claim against his share of investments in the Plan is diminished by the high recordkeeping and underperforming funds which were left languishing in the Plan whether they are specifically identified herein or not. Under IRS regulations, a participant in any retirement plan regulated by ERISA, always maintains a claim in the form of an undivided interest against a plan's trust for his or her share of the investment. *See*, 26 CFR § 1.414(I)-1. The amount of this undivided interest is diminished for all participants when a plan is paying excessive fees and maintains expensive and/or underperforming funds, as alleged below. *Id*.

20.     Plaintiff, Gerald L. Robinson ("Robinson"), resides in Mount Victory, Ohio. During his employment, Plaintiff Robinson participated in the Plan investing in the options offered by the Plan and was subject to the excessive RKA costs alleged below. Plaintiff Robinson suffered injury to his Plan account by overpaying for his share of RKA costs. Plaintiff Robinson specifically invested in the Target Retirement 2020 Fund complained of, below. He suffered further injury to his Plan account from the underperformance and excessive expense of this fund. In addition, Plaintiff Robinson suffered injury to his Plan account by having to pay for his share of consulting fees to maintain any of the lower performing or expensive funds in the Plan whether specifically identified herein or not, as described below. These funds were maintained and monitored with the assistance of Mercer Consulting who received at least $186,535 during 2020, the cost of which was borne by each participant in the Plan. Further, Plaintiff Robinson suffered injury to his Plan account by the fact that his claim against his share of investments in the Plan is diminished by the high recordkeeping and underperforming funds which were left languishing in the Plan whether they are specifically identified herein or not. Under IRS regulations, a participant in any retirement plan regulated by ERISA, always maintains a claim in the form of an undivided interest against a plan's trust for his or her share of the investment. *See*, 26 CFR § 1.414(I)-1. The amount of this

undivided interest is diminished for all participants when a plan is paying excessive fees and maintains expensive and/or underperforming funds, as alleged below. *Id.*

21. Plaintiff, Scott W. Anderson ("Anderson"), resides in Huntsville, Texas. During his employment, Plaintiff Anderson participated in the Plan investing in the options offered by the Plan and was subject to the excessive RKA costs alleged below. Plaintiff Anderson suffered injury to his Plan account by overpaying for his share of RKA costs. Plaintiff Anderson specifically invested in the Target Retirement 2050 Fund complained of, below. He suffered further injury to his Plan account from the underperformance and excessive expense of this fund. In addition, Plaintiff Anderson suffered injury to his Plan account by having to pay for his share of consulting fees to maintain any of the lower performing or expensive funds in the Plan whether specifically identified herein or not, as described below. These funds were maintained and monitored with the assistance of Mercer Consulting who received at least $186,535 during 2020, the cost of which was borne by each participant in the Plan. Further, Plaintiff Anderson suffered injury to his Plan account by the fact that his claim against his share of investments in the Plan is diminished by the high recordkeeping and underperforming funds which were left languishing in the Plan whether they are specifically identified herein or not. Under IRS regulations, a participant in any retirement plan regulated by ERISA, always maintains a claim in the form of an undivided interest against a plan's trust for his or her share of the investment. *See*, 26 CFR § 1.414(I)-1. The amount of this undivided interest is diminished for all participants when a plan is paying excessive fees and maintains expensive and/or underperforming funds, as alleged below. *Id.*

22. Plaintiff, Thomas A. Pitera ("Pitera"), resides in Lehigh Acres, Florida. During his employment, Plaintiff Pitera participated in the Plan investing in the options offered by the Plan and was subject to the excessive RKA costs alleged below. Plaintiff Pitera suffered injury to his Plan account by overpaying for his share of RKA costs. Plaintiff Pitera specifically invested in the Target Retirement 2050 Fund complained of, below. He suffered further injury to his Plan account

from the underperformance and excessive expense of this fund. In addition, Plaintiff Pitera suffered injury to his Plan account by having to pay for his share of consulting fees to maintain any of the lower performing or expensive funds in the Plan whether specifically identified herein or not, as described below. These funds were maintained and monitored with the assistance of Mercer Consulting who received at least $186,535 during 2020, the cost of which was borne by each participant in the Plan. Further, Plaintiff Pitera suffered injury to his Plan account by the fact that his claim against his share of investments in the Plan is diminished by the high recordkeeping and underperforming funds which were left languishing in the Plan whether they are specifically identified herein or not. Under IRS regulations, a participant in any retirement plan regulated by ERISA, always maintains a claim in the form of an undivided interest against a plan's trust for his or her share of the investment. *See*, 26 CFR § 1.414(I)-1. The amount of this undivided interest is diminished for all participants when a plan is paying excessive fees and maintains expensive and/or underperforming funds, as alleged below. *Id*.

23.     Plaintiff, Sharon Bradley-Smith ("Bradley-Smith"), resides in Houston, Texas. During her employment, Plaintiff Bradley-Smith participated in the Plan investing in the options offered by the Plan and was subject to the excessive RKA costs alleged below. Plaintiff Bradley-Smith suffered injury to her Plan account by overpaying for her share of RKA costs. Plaintiff Bradley-Smith specifically invested in the Target Retirement 2020 through 2060 Funds complained of, below. She suffered further injury to her Plan account from the underperformance and excessive expense of these funds. In addition, Plaintiff Bradley-Smith suffered injury to her Plan account by having to pay for her share of consulting fees to maintain any of the lower performing or expensive funds in the Plan whether specifically identified herein or not, as described below. These funds were maintained and monitored with the assistance of Mercer Consulting who received at least $186,535 during 2020, the cost of which was borne by each participant in the Plan. Further, Plaintiff Bradley-Smith suffered injury to her Plan account by the

fact that her claim against her share of investments in the Plan is diminished by the high recordkeeping and underperforming funds which were left languishing in the Plan whether they are specifically identified herein or not. Under IRS regulations, a participant in any retirement plan regulated by ERISA, always maintains a claim in the form of an undivided interest against a plan's trust for his or her share of the investment. *See*, 26 CFR § 1.414(I)-1. The amount of this undivided interest is diminished for all participants when a plan is paying excessive fees and maintains expensive and/or underperforming funds, as alleged below. *Id*.

24.     Plaintiff, Toranz J. Plummer ("Plummer"), resides in Fort Lauderdale, Florida. During his employment, Plaintiff Plummer participated in the Plan investing in the options offered by the Plan and was subject to the excessive RKA costs alleged below. Plaintiff Plummer suffered injury to his Plan account by overpaying for his share of RKA costs. Plaintiff Plummer specifically invested in the Target Retirement 2060 Fund complained of, below. He suffered further injury to his Plan account from the underperformance and excessive expense of this fund. In addition, Plaintiff Plummer suffered injury to his Plan account by having to pay for his share of consulting fees to maintain any of the lower performing or expensive funds in the Plan whether specifically identified herein or not, as described below. These funds were maintained and monitored with the assistance of Mercer Consulting who received at least $186,535 during 2020, the cost of which was borne by each participant in the Plan. Further, Plaintiff Plummer suffered injury to his Plan account by the fact that his claim against his share of investments in the Plan is diminished by the high recordkeeping and underperforming funds which were left languishing in the Plan whether they are specifically identified herein or not. Under IRS regulations, a participant in any retirement plan regulated by ERISA, always maintains a claim in the form of an undivided interest against a plan's trust for his or her share of the investment. *See*, 26 CFR § 1.414(I)-1. The amount of this undivided interest is diminished for all participants when a plan is paying excessive fees and maintains expensive and/or underperforming funds, as alleged below. *Id*.

25.     Plaintiffs have standing to bring this action on behalf of the Plan because they participated in the Plan and were injured by Defendants' unlawful conduct.  In addition, Plaintiffs have standing because they suffered damage to their plan accounts by having to pay their share of the consulting fee charged by Mercer Consulting to maintain and manage the funds specifically identified below which have excessive expense ratios and which include, but are not limited to, those funds not specifically identified but which are used to pay for the excessive total plan costs. Further, In addition, Plaintiffs have standing because their claims against their share of investments in the Plan is diminished by the high recordkeeping and underperforming funds suffered by the Plan whether they are specifically identified herein or not as discussed above.  Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

26.     Plaintiffs did not have knowledge of all material facts (including, among other things, total cost comparisons to similarly-sized plans) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

### Defendants

### Company Defendant

27.     Marmon is the sponsor of the Plan and a named fiduciary of the Plan with a principal place of business being 181 W. Madison Street, 26th Floor, Chicago, Illinois.  The December 31, 2020 Form 5500 of the Marmon Employees' Retirement Plan filed with the United States Department of Labor ("2020 Form 5500") at 1. Marmon describes itself as comprising "11 major business groups. These groups share expertise, knowledge and resources with and within

each other, with a singular focus … ."[6] These 11 business groups are: medical, water, foodservice technologies, retail solutions, transportation products, rail and leasing, electrical, plumbing and refrigeration, metal services, industrial products and crane services. *Id.*

28.     Marmon appointed the Committee to, among other things, ensure that the investments available to the Plan's participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. The Marmon Health, Inc., Statement of Investment Policy, Effective August 24, 2020 ("IPS") at 3. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

29.     Accordingly, Marmon during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

30.     For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**Board Defendants**

31.      Marmon, acting through its Board, appointed the Committee to, among other things, ensure that the investments available to the Plan's participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. IPS at 3. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

32.     Accordingly, each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section

---

[6] https://www.marmon.com/ last accessed on July 20, 2022.

3(21)(A), 29 U.S.C. § 1002(21)(A) because each had a duty to monitor the actions of the Committee.

33.     The Board and the unnamed members of the Board during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Board Defendants."

**Committee Defendants**

34.     A discussed above, Marmon and the Board appointed the Committee to, among other things, ensure that the investments available to the Plan's participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. IPS at 3. The IPS specifically provides that the Committee is charged with: "[e]stablishing and overseeing the investment options with the advice and assistance of the Investment Consultant." *Id.* The Committee is further charged with "[r]eviewing reports and recommendation provided by the Investment Consultant on investment performance and the investment program and continuing appropriateness of each investment option." *Id.* The Committee must review and approve all actions of the Investment Consultant who is charged with: "[a]dvising the Committee on the design and establishment of an investment program for the Plans, including target date fund options, passive core options, active core options, and specialty options … ." *Id.* As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

35.     The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

36.     The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

**Additional John Doe Defendants**

37.     To the extent that there are additional officers, employees and/or contractors of Marmon who are/were fiduciaries of the Plan during the Class Period, or were hired as investment manager(s) for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserves the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, Marmon officers, employees and/or contractors who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## IV.   CLASS ACTION ALLEGATIONS[7]

38.     Plaintiffs brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[8]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between August 16, 2016 through the date of judgment (the "Class Period").

39.     The members of the Class are so numerous that joinder of all members is impractical.  The 2020 Form 5500 lists 13,667 Plan "participants with account balances as of the end of the plan year."  2020 Form 5500 at 2.

---

[7] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plan because class certification is not necessarily required for Plaintiffs to prosecute claims on behalf of the Plan and all participants.  *See, e.g.*, *In re: Wilmington Trust Corp.*, 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims).  ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

[8] Plaintiffs reserve the right to propose other or additional classes or subclasses in his motion for class certification or subsequent pleadings in this action.

40.     Plaintiffs' claims are typical of the claims of the members of the Class.  Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated the Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

41.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

      A.      Whether Defendants are/were fiduciaries of the Plan;

      B.      Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

      C.      Whether the Company and Board Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

      D.      The proper form of equitable and injunctive relief; and

      E.      The proper measure of monetary relief.

42.     Plaintiffs will fairly and adequately represent the Class and has retained counsel experienced and competent in the prosecution of ERISA class action litigation.  Plaintiffs have no interests antagonistic to those of other members of the Class.  Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

43.     This action may be properly certified under Rule 23(b)(1).  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the

members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

44. In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V. THE PLAN

45. The Plan is a "defined contribution" plan within the meaning of ERISA Section 3(34), 29 U.S.C. §1002(34). The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. The 2020 Auditor Report at 5. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account. *Id.*

### Eligibility

46. In general, regular full-time employees are eligible to participate in the Plan. 2020 Auditor Report at 5.

### Contributions

47. There are several types of contributions that can be added to a participant's account, including: an employee salary deferral contribution, an employee Roth 401(k) contribution, an

employee after-tax contribution, catch-up contributions for employees aged 50 and over, rollover contributions, discretionary profit-sharing contributions and employer matching contributions based on employee pre-tax, Roth 401(k), and employee after-tax contributions. *Id.*

48.     With regard to employee contributions to the Plan: "[e]ach participant may elect to contribute up to 85% of his or her eligible compensation to the Plan on a pre-tax (traditional) basis or on an after-tax (Roth) basis (both as salary deferral contributions)." *Id.* Marmon will make discretionary matching contributions to the Plan on behalf of its employees which are made "in the sole and absolute discretion of the Company's management in the form of profit-sharing contributions." *Id.*

49.     Like other companies that sponsor a 401(k) plan for their employees, Marmon enjoys both direct and indirect benefits by providing matching contributions to the Plan's participants.  Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

50.     Marmon also benefits in other ways from the Plan's matching program.  It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See,* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

51.     Given the size of the Plan, Marmon likely enjoyed a significant tax and cost savings from offering a match.

***Vesting***

52.     With regard to contributions made by participants to the Plan: [p]articipants are immediately 100 percent vested" in their salary deferral contributions. 2020 Auditor Report at 6. However, participants are subject to a five-year vesting schedule for contributions made by Marmon. *Id.*

17

*The Plan's Investments*

53.     In theory, the Committee determines the appropriateness of the Plan's investment offerings and monitors investment performance. IPS at 3. As will be discussed in more detail below, the Committee fell well short of these fiduciary goals.

54.     Several funds were available to Plan participants for investment each year during the putative Class Period.  Specifically, a participant may direct all contributions to selected investments as made available and determined by the Committee. *Id.*

55.     The Plan's assets under management for all funds as of December 31, 2020 was $1,116,839,813.

*Payment of Plan Expenses*

56.     During the Class Period, administrative expenses were paid for using a combination of direct charges to participants and Plan assets. 2020 Auditor Report at 7.

**VI.     THE PLAN'S FEES DURING THE CLASS PERIOD WERE UNREASONABLE**

     A.  **The Totality of the Circumstances Demonstrates that the Plan's Fiduciaries Failed to Administer the Plan in a Prudent Manner**

57.     As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

58.     Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for monitoring the Plan's fees, because this information is solely within the possession of Defendants prior to discovery.  This information includes recordkeeping agreements which are within the sole possession of Plan sponsors and not made available to plan participants.  *See Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA

will suffer.") In fact, in an attempt to discover the details of the Plan's mismanagement, on November 2, 2021, the majority of the Plaintiffs wrote to Marmon requesting, *inter alia*, meeting minutes from the Committee. By letter dated, December 2, 2021, Marmon denied the Plaintiffs' request for meeting minutes.

59. Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process. But in most cases, even that is not sufficient. For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence. Deliberative processes can vary in quality or can be followed in bad faith. In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote et al. v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

60. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding Defendants' decision-making processes based upon the numerous factors set forth below.

61. Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in, *inter alia*, the imposition of excessive administrative and record keeping fees which wasted the assets of the Plan and the assets of participants.

**B. Defendants Failed to Adequately Monitor the Plan's Administrative and Recordkeeping Expenses**

62. A clear indication of Defendants' imprudent fee monitoring process was the excessive recordkeeping and administrative fees (defined above as RKA costs) Plan participants were required to pay during the Class Period.

63. The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Recordkeeping and administrative services fees are one and the same and the terms are used synonymously herein.

64. There are two types of essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan). First, an overall suite of recordkeeping services is provided to large plans as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided, in retirement industry parlance, on an "all-you-can-eat" basis), including, but not limited to, the following services:

A. Recordkeeping;

B. Transaction processing (which includes the technology to process purchases and sales of participants' assets, as well as providing the participants access to investment options selected by the plan sponsor);

C. Administrative services related to converting a plan from one recordkeeper to another;

D. Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other materials distributed to participants, *e.g.*, summary plan descriptions);

E. Maintenance of an employer stock fund (if needed);

F. Plan document services, which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

G. Plan consulting services, including assistance in selecting the investment lineup offered to participants;

H. Accounting and audit services, including the preparation of annual reports, *e.g.*, Form 5500s[9] (excluding the separate fee charged by an independent third-party auditor);

I. Compliance support, including assistance interpreting plan provisions and ensuring the operation of the plan is in compliance with legal requirements and the provisions of the plan (excluding separate legal services provided by a third-party law firm); and

J. Compliance testing to ensure the plan complies with U.S. Internal Revenue Service nondiscrimination rules.

65. This suite of essential recordkeeping services can be referred to as "Bundled" services. These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan. The services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services.

66. The second type of essential recordkeeping services, hereafter referred to as "A La Carte" services, provided by all national recordkeepers, often has separate, additional fees based on the conduct of individual participants and the usage of the services by individual participants. These fees are distinct from the bundled arrangement described above to ensure that one participant is not forced to help another cover the cost of, for example, taking a loan from their plan account balance. These A La Carte services typically include, but are not limited to, the following:

A. Loan processing;

B. Brokerage services/account maintenance (if offered by the plan);

C. Distribution services; and

D. Processing of qualified domestic relations orders.

---

[9]The Form 5500 is the annual report that 401(k) plans are required to file with the DOL and U.S. Department of Treasury pursuant to the reporting requirements of ERISA.

67.     All national recordkeepers have the capability to provide all of the aforementioned recordkeeping services at very little cost to all large defined contribution plans, including those much smaller than the Plan.  In fact, several of the services, such as managed account services, self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing are often a profit center for recordkeepers.

68.     For large plans with greater than 5,000 participants, any minor variations in the way that these essential RKA services are delivered have no material impact on the fees charged by recordkeepers to deliver the services. That fact is confirmed by the practice of all recordkeepers quoting fees for the Bundled RKA services on a per-participant basis without regard for any individual differences in services requested—which are treated by recordkeepers as immaterial because they are, in fact, inconsequential to recordkeepers from a cost perspective

69.     Here, the Plan stayed with the same recordkeeper throughout the Class Period, namely, Mass Mutual.

70.     Mass Mutual provided services in line with the routine bundled and A La Carte service categories described above.

71.     The cost of recordkeeping services depends on the number of participants (or participant accounts), not on the amount of assets in the participant's account.[10]  Thus, prudent fiduciaries negotiate a fixed dollar amount for the recordkeeper's annual compensation, usually based on a rate of a fixed dollar amount per participant.  Because of economies of scale, large plans get lower effective rates per participant than smaller plans.  Plans with 5,000 participants or more can obtain much lower rates per participant than a plan with 500 participants.

---

[10] "[T]he actual cost of administrative services is more dependent on the number of participants in the plan."  There is no "logical or practical correlation between an increase in administrative fees and an increase in plan assets."  Hewitt Associates, LLC, *Be a Responsible Fiduciary: Ask the Right Questions About 401(k) Plan Fees*, Oct. 2008; *see also* Mercer Investment Consulting, Inc., *DC Fee Management – Mitigating Fiduciary Risk and Maximizing Plan Performance* (2013), https://www.mercer.com/content/dam/mercer/

72.     The marginal cost of adding an additional participant to a recordkeeping platform is relatively low. These economies of scale are inherent in all recordkeeping arrangements for defined contribution plans, including the Plan. As a plan's participant count increases, the recordkeeper's fixed costs of providing RKA services are spread over a larger population, thereby reducing the average unit cost of delivering services on a per-participant basis.

73.     Further, although utilizing a revenue sharing approach is not *per se* imprudent, unchecked, it is devastating for plan participants (*e.g., see* allegations *infra*). "At worst, revenue sharing is a way to hide fees. Nobody sees the money change hands, and very few understand what the total investment expense pays for. It's a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of). In some cases, employers and employees believe the plan is 'free' when it is in fact expensive." Justin Pritchard, "Revenue Sharing and Invisible Fees" available at http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited January 17, 2021).

74.     Because recordkeeping costs are not affected by account size, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees as a fixed dollar amount rather than as a percentage of assets. *See* Mercer Best Practices at 3. Otherwise, as plan assets grow, the recordkeeping compensation increases without any change in the recordkeeping services, leading to unreasonable fees.

75.     As demonstrated in the charts below, the continued use of Mass Mutual without a significant attempt to reduce these fees resulted in a worst-case scenario for the Plan's participants because it saddled the Plan's participants with above-market administrative and recordkeeping fees throughout the Class Period.

76.     The Plan's per participant RKA fees were as follows:

| Year | Participants | Total Fees Paid to Mass Mutual | $PP |
|------|--------------|--------------------------------|------|
| 2016 | 10104 | $1,392,267.00 | $137.79 |

| Year | Participants | Total Fees Paid to Mass Mutual | $PP |
|---|---|---|---|
| 2017 | 10226 | $985,471.00 | $96.37 |
| 2018 | 10648 | $845,411.00 | $79.40 |
| 2019 | 11581 | $873,890.00 | $75.46 |
| 2020 | 13667 | $914,285.00 | $66.90 |

77.     The above fees were astronomical when benchmarked against similar plans.

78.     Just as one example, in 2018 (2019 for the Pacific plan) four plans recordkept by Fidelity, a national recordkeeper like Mass Mutual, with almost the same number of participants as the Plan had in 2020 charged almost half of the Plan's recordkeeping fee:

| Comparable Plans' RKA Fees Paid | | | | |
|---|---|---|---|---|
| Plan Name | Partici-pants | Assets Under Management | RKA Costs /pp[11] | Record-keeper |
| Sutter Health Retirement Income Plan | 13,248 | $406,000,195 | **$35** | Fidelity |
| Fortive Retirement Savings Plan | 13,502 | $1,297,404,611 | **$35** | Fidelity |
| DHL Retirement Savings Plan | 14,472 | $806,883,596 | **$33** | Fidelity |
| Pacific Architects and Engineers, LLC 401(k) Savings Plan | 14,698 | $435,391,716 | **$23** | Fidelity |

79.     During the Class Period, the Plan had a low of approximately 10,000 total participants in 2016 to a high of 13,667 total participants in 2020 making it eligible for some of the lowest fees on the market.

80.     As explained above, due to the economies of scale as a plan's participant count increases, the recordkeeper's fixed costs of providing RKA services are spread over a larger

---

[11] In order to keep this comparator analysis consistent with the Marmon analysis above, RKA costs in the chart are derived, in the same manner as for Marmon, from Schedule C of the Form 5500s and reflect fees paid to service providers with service codes that signify recordkeeping, codes such as "15," "37," "60," "62," "64" and/or "65." These are just some examples, but are not limited to, these codes which are the most common codes associated with recordkeeping. In addition, the comparator plans chosen are plans that have little to no revenue sharing and it's for this reason that revenue sharing from a plan's funds are not added to per participant amounts.

population, thereby reducing the average unit cost of delivering services on a per-participant basis. Accordingly, one would expect the per participant RKA costs for a plan with 10,000 participants to be lower than a plan with 5,000 participants.

81.     Looking at recordkeeping costs for a range of plans, smaller to slightly larger than the Plan, shows that the Plan was paying higher recordkeeping fees than its peers. The chart below analyzes plans between 3,000 to 18,600 participants but yet had lower RKA costs than the Plan between 2013 and 2019:

| Year | Plan Name | Assets | Prtcpnts | Part Fee[12] | Recordkeeper |
|------|-----------|--------|----------|----------|--------------|
| 2013 | Wrigley Savings Plan | $446 million | 3,146 | $26.69 | Mercer HR Services, LLC |
| 2014 | Wrigley Savings Plan | $449 million | 3,132 | $29.21 | Mercer HR Services, LLC |
| 2014 | HealthFirst Profit Sharing 401(k) | $123 million | 3,732 | $32.74 | Verisight, Inc. |
| 2018 | Bausch Health Companies Inc. Retirement Savings Plan | $904,717,349 | 8,902 | $36 | Fidelity |
| 2018 | Children's Medical Center of Dallas Employee Savings Plan 403(b) | $349,335,673 | 9,356 | $36 | Fidelity |
| 2018 | Ralph Lauren 401(k) Plan | $552,586,935 | 9,389 | $31 | T.Rowe |
| 2018 | Vibra Healthcare Retirement Plan | $107,652,510 | 9,750 | $28 | Great-West |
| 2018 | Republic National 401(k) | $671,989,839 | 9,922 | $33 | Great-West |
| 2018 | Southern California Permanente Medical Group Tax Savings Retirement Plan | $773,795,904 | 10,770 | $31 | Vanguard |
| 2019 | First American Financial Corporation 401(K) Savings Plan | $1,791,281,396 | 15,246 | $35 | Fidelity |

---

[12] RKA costs in the chart are derived, in the same manner as for Marmon, from Schedule C of the Form 5500s and reflect fees paid to service providers with service codes that signify recordkeeping, codes such as "15," "37," "60," "62," "64" and/or "65," are some examples, but are not limited to, these codes which are the most common codes associated with recordkeeping. In addition, the comparator plans chosen are plans that have little to no revenue sharing and it's for this reason that revenue sharing from a plan's funds are not added to per participant amounts.

| Year | Plan Name | Assets | Prtcpnts | Part Fee[12] | Recordkeeper |
|------|-----------|--------|----------|---------|--------------|
| 2019 | First American Financial Corporation 401(K) Savings Plan | $1,791,281,396 | 15,246 | $35 | Fidelity |
| 2019 | FedEx Office and Print Services, Inc. 401(k) Retirement Savings Plan | $939,399,569 | 18,674 | $25 | Vanguard |

82.     Thus, the Plan, with over 10,000 participants and over $895 million dollars in assets in 2018, should have been able to negotiate recordkeeping costs ranging from $23 to the low $30 range from the beginning of the Class Period to the present. Anything above that would be an outlier especially later in the Class Period when RKA costs per participant should have been at the cheapest.[13]  Given that both smaller and larger plans, and sane sized plans were able to obtain lesser RKA fees speaks volumes regarding the lack of prudence exercised by Defendants.

83.     The relative similarity of the recordkeeping fees of the comparator plans also speaks to the fact that there is relatively little difference in costs for prudently managed plans because recordkeepers on the whole provide the same bucket of services to all plans.  There is nothing special about the Plan's demographics or industry that would require it to obtain services much different from the run-of-the-mill services provided by all national recordkeepers like Mass Mutual.  And there is certainly no justification for Mass Mutual to charge twice ss much for recordkeeping as the Plan's peers paid even if there were slight differences in service that required additional payment to a recordkeeper.

84.     In order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.  To the extent that a plan's investments pay asset-based revenue

---

[13] *Gordon v. Mass Mutual*, Case 13-30184, Doc. 107-2 at ¶10.4 (D.Mass. June 15, 2016) (401(k) fee settlement committing the Plan to pay not more than $35 per participant for recordkeeping).

sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

85.     A plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace.  More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015); *see also* NEPC 2020 Defined Contribution Progress Report ("NEPC Study") at 10 ("Best Practice is to compare fees and services through a record keeping vendor search Request for Proposal process"). [14]

86.     The 22nd Edition of the 401(k) Averages study, confirms these findings. Without factoring in amounts of revenue sharing, as is done here, the 401(k) Averages study found that the average plan with over 2,000 participants and 200 million in assets, paid no more than $13 per participant. 401(k) Averages Book, 22nd Edition, Pension Data Source, Inc., ("401(k) Averages") at 108.

87.     The fact that the Plan has stayed with the same primary recordkeeper, namely Mass Mutual throughout the Class Period and paid the relatively same amount in recordkeeping fees

---

[14] Available at
https://f.hubspotusercontent00.net/hubfs/2529352/2020%20DC%20Plan%20and%20Fee%20Survey/2020%20NEPC%20DC%20Plan%20Progress%20Report.pdf

from 2016 to the present, there is little to suggest that Defendants conducted a RFP at reasonable intervals – or certainly at any time prior to 2016 through the present - to determine whether the Plan could obtain better recordkeeping and administrative fee pricing from other service providers given that the market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service.

88.    Given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost.

### C.    The Target Date Funds and Other Funds Offered by the Plan Deprived Participants of Meaningful Returns

89.    Many 401(k) plans offer a group of investments commonly known as a target date suite. Target date suites typically consist of several funds from the same family of funds focusing on an individual's anticipated date of retirement. Typically, a target date suite will consist of funds that consider an individual's anticipated retirement date at 5-year intervals, depending on the individual. For example, there may be six funds in the same target date suite but one of those funds may be focused on older investors with an anticipated retirement date of 2030, for example and another fund in the same suite may be focused on younger investors with an anticipated retirement date in 2055.

90.    The Financial Industry Regulatory Authority, commonly known as FINRA, which acts as the watchdog for the financial industry, describes target date funds as follows:

> Target-date funds are designed to help manage investment risk. You pick a fund with a target year that is closest to the year you anticipate retiring, say a "2050 Fund." The closer a fund gets to its target date, the more it focuses on assets that traditionally have a lower risk profile, such as fixed income, cash and cash equivalents. This shift across asset classes is called a "glide path." A fund's glide path is designed to reduce investment risk over time—but glide paths can vary considerably from fund to fund.

Save the Date: Target-Date Funds Explained published by FINRA dated April 21, 2022, available on its website at https://www.finra.org/investors/insights/save-date-target-date-funds-explained. Last accessed on May 4, 2022.

91.     Further, a target date suite typically will consist of a mix of different underlying funds that have different risk and return profiles. As a person's anticipated retirement date approaches, the fund is designed to reduce the percentages of the higher risk investments to make fund more stable given the nearing retirement date. Conversely, the fund targeted at investors with a 2060 retirement date will have more risk with a potential for greater returns to help a younger investor build his or her nest egg. *See, Id.*

92.     Generally, most target funds will consist of several underlying mutual funds some with higher risk and some that are lower risk for those closer to retirement. For example, the 2030 fund might consist of the same 10 mutual funds as the 2060 fund but the 2030 fund will have a greater percentage of its assets invested in the funds with lower risk since a person anticipating retiring in 2030 will want to have a lower risk investment to ensure funds will be available for their retirement.

93.     Here, the Defendants decided to create their own suite of target date funds, a practice which is baffling giving the number of excellent target date suites available on the market. Commercially available target dates are generally managed by individuals with many years of experience in the investment industry. However, the performance of the instant funds created by the Defendants severely lagged in performance as compared to readily available target date suites.[15] Given this, it was clear breach of fiduciary duty to have created these poorly performing

---

[15] Should it be the case that the Marmon target date funds were in fact prepackaged products, which seems unlikely, the analysis is the same for both the target date funds and the additional funds discussed in this section. In addition, if that was the case, it's a clear the Plan should not have selected funds that had been created days earlier which lacked any performance history.

target date funds instead of choosing from the many better performing target date suites with expected stability for each expected retirement date.

94. The Defendants, as fiduciaries to the Plan, should have recognized that their target date funds were not functioning as expected and should have replaced them at the beginning of the Class Period[16]. The chart below analyzes the performance of properly performing target date funds as compared to the Plan's target date suite. These alternates are just a few from many that could have been selected for the Plan.

| Name | Ticker | Total Return 2019[17] | Total Return 2020 |
|---|---|---|---|
| **Marmon 2025 TDF** | **N/A** | **N/A** | 12.37% |
| American Funds 2025 Trgt Date Retire R6 | RFDTX | -3.47% | 13.67% |
| T. Rowe Price Retirement I 2025 I | TRPHX | -5.54% | 14.62% |
| | | | |
| **Marmon 2030 TDF** | **N/A** | **N/A** | 13.62% |
| American Funds 2030 Trgt Date Retire R6 | RFETX | 20.06% | 15.16% |
| T. Rowe Price Retirement I 2030 I | TRPCX | 22.68% | 15.92% |
| | | | |
| **Marmon 2035 TDF** | **N/A** | **N/A** | 14.46% |
| American Funds 2035 Trgt Date Retire R6 | RFFTX | 23.29% | 17.55% |
| T. Rowe Price Retirement I 2035 I | TRPJX | 23.90% | 17.04% |
| | | | |
| **Marmon 2040 TDF** | **N/A** | **N/A** | 14.11% |
| American Funds 2040 Trgt Date Retire R6 | RFGTX | 24.40% | 18.77% |
| T. Rowe Price Retirement I 2040 I | TRPDX | 24.89% | 18.16% |
| | | | |
| **Marmon 2045 TDF** | **N/A** | **N/A** | 14.05% |
| American Funds 2045 Trgt Date Retire R6 | RFHTX | 24.68% | 19.21% |
| T. Rowe Price Retirement I 2045 I | TRPKX | 25.52% | 18.72% |
| | | | |

---

[16] The current target date suite had an inception date of August 7, 2017, which is the same date the funds became available in the Plan. This is further evidence that the current target date lineup was created by the Plan. Prior to August 7th of 2017, the Plan had a similar set of target date funds which were created by the Plan. It's expected that these funds would similarly have had serious performance issues as compared to readily available target date suites.

[17] Due to the fact that the target date suite created by the Plan had an inception date of August 7, 2017 no performance data is available for 2019 but it's expected that once performance data is available the results for 2019, 2018 and part of 2017 will be similar to those seen in 2020.

| Name | Ticker | Total Return 2019[17] | Total Return 2020 |
|---|---|---|---|
| **Marmon 2050 TDF** | **N/A** | **N/A** | 14.35% |
| American Funds 2050 Trgt Date Retire R6 | RFITX | 25.04% | 19.42% |
| T. Rowe Price Retirement I 2050 I | TRPMX | 25.57% | 18.72% |
| | | | |
| **Marmon 2055 TDF** | **N/A** | **N/A** | 14.31% |
| American Funds 2055 Trgt Date Retire R6 | RFKTX | 25.09% | 19.39% |
| T. Rowe Price Retirement I 2055 I | TRPNX | 25.52% | 18.68% |
| | | | |
| **Marmon 2060 TDF** | **N/A** | **N/A** | **14.33%** |
| American Funds 2060 Trgt Date Retire R6 | RFUTX | 25.01% | 19.44% |
| T. Rowe Price Retirement I 2060 I | TRPLX | 25.48% | 18.79% |

95.     As demonstrated by the above chart, the target date funds offered by the Plan lagged well behind their peers in performance. Clearly, the fact that Marmon decided to create its own target date funds for the Plan was an error which cost the Plan millions in lost savings. Had the Defendants been acting in the sole interests of Plan participants throughout the Class Period, as required by ERISA, alternate better performing funds would have been selected and utilized as early as the start of the Class Period rather than allowing the Plan languish under the burden of the target date suite created by Marmon, its advisors and/or affiliates.

96.     Further, the alternative target date funds discussed in the chart above, are only some examples of properly performing target dates with reliable performance histories. These funds were specifically selected because they match the goals of Marmon's investment policies. In most cases, there are collective investment trusts or CITs which mirror the mutual fund options discussed above. Such CITs would have even lower fees, better performance histories and would have been managed in a nearly identical fashion to their mutual fund counterparts.

97.     Further, there were several underperforming non-target date funds in the Plan which appear to have been created by Marmon, its advisors and/or affiliates which have similarly poor performance histories, as detailed in the chart below:

| Name | Ticker | Total Return 2020 |
|---|---|---|
| **Marmon US Large Cap** | **N/A** | 19.13 |
| JPMorgan US Equity R6 | JUEMX | 26.74 |
| ClearBridge Sustainability Leaders IS | LCILX | 35.79 |
| Pioneer Y | PYODX | 24.33 |
| Touchstone Large Cap Focused Instl | SCRLX | 24.23 |
| | | |
| **Marmon Int'l Stock** | **N/A** | 15.38 |
| Catholic Rspnsbl Invstmnts Intl Eq Ins | CRLSX | 19.91 |
| Goldman Sachs International Eq ESG R6 | GSIWX | 23.26 |
| Hartford Schroders International Stk I | SCIEX | 24.91 |
| Thornburg Better World International I | TBWIX | 26.75 |
| | | |
| **Marmon SMID** | **N/A** | **15.2** |
| Conestoga SMid Cap Investors | CCSMX | 28.44 |
| Delaware Smid Cap Growth R6 | DFZRX | 94.51 |
| RMB SMID Cap I | RMBMX | 24.39 |
| RBC SMID Cap Growth I | TMCIX | 20.51 |

98.     Similar to the target date funds above, these funds lagged well behind their peers in performance. Clearly, the fact that Marmon decided to create its own funds for the Plan was an error which cost the Plan millions in lost savings. Had the Defendants been acting in the sole interests of Plan participants throughout the Class Period, as required by ERISA, alternate better performing funds would have been selected and utilized as early as the start of the Class Period rather than allowing the Plan languish under the burden of the funds created by Marmon, its advisors and/or affiliates.

### FIRST CLAIM FOR RELIEF
### Breach of Fiduciary Duty of Prudence
### (Asserted against the Committee)

99.     Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

100.    At all relevant times, the Committee and its members during the Class Period ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A),

29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

101.     As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).  These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

102.     The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. The Prudence Defendants selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments. The Prudence Defendants also failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan.

103.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns.  Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

104.     Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

105.     The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches

by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## SECOND CLAIM FOR RELIEF
### Failure to Adequately Monitor Other Fiduciaries
### (Asserted against Marmon and the Board Defendants)

106.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

107.    Marmon and the Board (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

108.    In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not fulfilling those duties.

109.    The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants.

110.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

        (a)    Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered

significant losses as a result of the Committee Defendants' imprudent actions and omissions;

(b)     failing to monitor the processes by which the Plan investments were evaluated, their failure to investigate the availability of lower-cost share classes; and

(c)     failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and Plan's participants' retirement savings.

111.     As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had the Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

112.     Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee Defendants.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.     A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.     Designation of Plaintiffs as a Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.      A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.      An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.      An order requiring the Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Defendants as necessary to effectuate said relief, and to prevent the Defendants' unjust enrichment;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.      Such other and further relief as the Court deems equitable and just.

Date: November 7, 2022        **CAPOZZI ADLER, P.C.**

*/s/ Donald R. Reavey*
Donald R. Reavey, Esquire
(*Admitted to General Bar ND ILL*)
PA Attorney ID #82498
2933 North Front Street
Harrisburg, PA 17110
Email: donr@capozziadler.com
Tel: (717) 233-4101
Fax: (717) 233-4103

*/s/ Mark K. Gyandoh*
Mark K. Gyandoh, Esquire
(*Admitted to General Bar ND ILL*)
PA Attorney ID # 88587
Gabrielle Kelerchian, Esquire
PA Attorney ID # 324248
(*Pro Hac Admission to be Requested*)
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
Email: markg@capozziadler.com
        gabriellek@capozziadler.com
Tel: (610) 890-0200
Fax: (717) 233-4103

Counsel for Plaintiffs and the Putative Class

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 7, 2022, a true and correct copy of the foregoing document was filed with the Court utilizing its ECF system, which will send notice of such filing to all counsel of record.


By: */s/ Mark K. Gyandoh*