## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JENNIFER R. LARD, JOHN G. JUERGENS, GERALD L. ROBINSON, SCOTT W. ANDERSON, THOMAS A. PITERA, SHARON BRADLEY-SMITH and TORANZ J. PLUMMER, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) ) | **CIVIL ACTION NO.: 1:22-cv-4332** **Honorable John R. Blakey** |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| MARMON HOLDINGS, INC., THE BOARD OF DIRECTORS OF MARMON HOLDINGS, INC., MARMON RETIREMENT ADMINISTRATIVE COMMITTEE and JOHN DOES 1-30, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## SECOND AMENDED CLASS ACTION COMPLAINT[1]

Plaintiffs, Jennifer R. Lard, John G. Juergens, Gerald L. Robinson, Scott W. Anderson, Thomas A. Pitera, Sharon Bradley-Smith and Toranz J. Plummer, ("Plaintiffs"), by and through their attorneys, on behalf of Marmon Employees' Retirement Plan ("Plan"),[2] themselves and all others similarly situated, state and allege as follows:

### I.    INTRODUCTION

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Marmon Holdings, Inc.,  ("Marmon" or "Company"), the Board

---

[1]  Plaintiffs file this Second Amended Complaint pursuant to the Memorandum and Order of this Honorable Court dated September 22, 2023 (ECF No. 42) and the Court's granting of Plaintiffs' unopposed oral motion for an extension of time until October 27, 2023 during the October 11, 2023 status hearing.

[2]   The Plans are legal entities that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).  However, in a breach of fiduciary duty action such as this, the Plans are not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plans and their participants.

of Directors of Marmon Holdings, Inc., and its members during the Class Period[3] ("Board"), and the Marmon Retirement Administrative Committee and its members during the Class Period ("Committee") for breaches of their fiduciary duties.

2.      To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries.  Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009).  Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope.  29 U.S.C. § 1104(a)(1)(B).

3.      The Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices."  *See,* "*A Look at 401(k) Plan Fees*," *supra*, at n.3; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (*Tibble I*) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

4.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options.  "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), § 7.

---

[3] The Class Period, as will be discussed in more detail below, is defined as August 16, 2016 through the date of judgment.

5.     "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[4]

6.     Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

7.     The Supreme Court recently reiterated that interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. *Hughes v. Northwestern Univ.*, 2022 WL 19935, at *3 (2022).

8.     Most participants in defined contribution plans like 401(k) or 403(b) plans expect that their accounts will be their principal source of income after retirement.  Although at all times plan accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices by plan sponsors and fiduciaries, whether due to poor performance, high fees or both.

---

[4] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

9.     Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their retirement plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low-cost investment options are being made available to plan participants.

10.     At all times during the Class Period, the Plan had at least $870 million dollars in assets under management and 10,000 participants with account balances.  At the end of 2020 and 2019, the Plan had over $1.1 billion dollars and $1 billion dollars, respectively, in assets under management that were/are entrusted to the care of the Plan's fiduciaries. The December 31, 2020 Report of Independent Auditor of the Marmon Employees' Retirement Plan ("2020 Auditor Report") at 3.

11.     The Plan's assets under management qualifies it as a large plan in the defined contribution plan marketplace, and among the largest plans in the United States.  Indeed, the Plan's assets placed it in the top 0.2% of all 401(k) plans by plan size.[5]  As a large plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.  Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure they were prudent.

12.     Plaintiffs allege that during the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; and (2) maintaining certain

---

[5] The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2018 (pub. July 2021).

funds in the Plan despite the availability of identical or similar investment options with lower costs and/or better performance histories.

13.     Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104.  Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

14.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II.    JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

16.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

17.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.    PARTIES

### Plaintiffs

18.     Plaintiff, Jennifer R. Lard ("Lard"), resides in Meridian, Mississippi. During her employment, Plaintiff Lard participated in the Plan investing in the options offered by the Plan.

5

Plaintiff Lard specifically invested in the Target Retirement 2040 Fund complained of below. She suffered further injury to her Plan account from the underperformance and excessive expense of this fund. In addition, Plaintiff Lard suffered injury to her Plan account by having to pay for her share of consulting fees to maintain any of the lower performing or expensive funds in the Plan whether specifically identified herein or not, as described below. These funds were maintained and monitored with the assistance of Mercer Consulting who received at least $186,535 during 2020, the cost of which was borne by each participant in the Plan. Further, Plaintiff Lard suffered injury to her Plan account by the fact that her claim against her share of investments in the Plan is diminished by the underperforming funds which were left languishing in the Plan whether they are specifically identified herein or not. Under IRS regulations, a participant in any retirement plan regulated by ERISA, always maintains a claim in the form of an undivided interest against a plan's trust for his or her share of the investment. *See*, 26 CFR § 1.414(I)-1. The amount of this undivided interest is diminished for all participants when a Plan is paying excessive fees and maintains expensive and/or underperforming funds, as alleged below. *Id*.

19.     Plaintiff, John J. Juergens ("Juergens"), resides in Geneva, Illinois. During his employment, Plaintiff Juergens participated in the Plan investing in the options offered by the Plan. Plaintiff Juergens specifically invested in the Target Retirement 2040 Fund complained of, below. He suffered further injury to his Plan account from the underperformance and excessive expense of this fund. In addition, Plaintiff Juergens suffered injury to his Plan account by having to pay for his share of consulting fees to maintain any of the lower performing or expensive funds in the Plan whether specifically identified herein or not, as described below. These funds were maintained and monitored with the assistance of Mercer Consulting who received at least $186,535 during 2020, the cost of which was borne by each participant in the Plan. Further, Plaintiff Juergens suffered injury to his Plan account by the fact that his claim against his share of investments in the Plan is diminished by the underperforming funds which were left languishing in the Plan whether they are

specifically identified herein or not. Under IRS regulations, a participant in any retirement plan regulated by ERISA, always maintains a claim in the form of an undivided interest against a plan's trust for his or her share of the investment. *See*, 26 CFR § 1.414(I)-1. The amount of this undivided interest is diminished for all participants when a plan is paying excessive fees and maintains expensive and/or underperforming funds, as alleged below. *Id*.

20.    Plaintiff, Gerald L. Robinson ("Robinson"), resides in Mount Victory, Ohio. During his employment, Plaintiff Robinson participated in the Plan investing in the options offered by the Plan. Plaintiff Robinson specifically invested in the Target Retirement 2020 Fund complained of, below. He suffered further injury to his Plan account from the underperformance and excessive expense of this fund. In addition, Plaintiff Robinson suffered injury to his Plan account by having to pay for his share of consulting fees to maintain any of the lower performing or expensive funds in the Plan whether specifically identified herein or not, as described below. These funds were maintained and monitored with the assistance of Mercer Consulting who received at least $186,535 during 2020, the cost of which was borne by each participant in the Plan. Further, Plaintiff Robinson suffered injury to his Plan account by the fact that his claim against his share of investments in the Plan is diminished by the high recordkeeping and underperforming funds which were left languishing in the Plan whether they are specifically identified herein or not. Under IRS regulations, a participant in any retirement plan regulated by ERISA, always maintains a claim in the form of an undivided interest against a plan's trust for his or her share of the investment. *See*, 26 CFR § 1.414(I)-1. The amount of this undivided interest is diminished for all participants when a plan is paying excessive fees and maintains expensive and/or underperforming funds, as alleged below. *Id*.

21.    Plaintiff, Scott W. Anderson ("Anderson"), resides in Huntsville, Texas. During his employment, Plaintiff Anderson participated in the Plan investing in the options offered by the Plan. Plaintiff Anderson specifically invested in the Target Retirement 2050 Fund complained of,

below. He suffered further injury to his Plan account from the underperformance and excessive expense of this fund. In addition, Plaintiff Anderson suffered injury to his Plan account by having to pay for his share of consulting fees to maintain any of the lower performing or expensive funds in the Plan whether specifically identified herein or not, as described below. These funds were maintained and monitored with the assistance of Mercer Consulting who received at least $186,535 during 2020, the cost of which was borne by each participant in the Plan. Further, Plaintiff Anderson suffered injury to his Plan account by the fact that his claim against his share of investments in the Plan is diminished by the underperforming funds which were left languishing in the Plan whether they are specifically identified herein or not. Under IRS regulations, a participant in any retirement plan regulated by ERISA, always maintains a claim in the form of an undivided interest against a plan's trust for his or her share of the investment. *See*, 26 CFR § 1.414(I)-1. The amount of this undivided interest is diminished for all participants when a plan is paying excessive fees and maintains expensive and/or underperforming funds, as alleged below. *Id*.

22.    Plaintiff, Thomas A. Pitera ("Pitera"), resides in Lehigh Acres, Florida. During his employment, Plaintiff Pitera participated in the Plan investing in the options offered by the Plan. Plaintiff Pitera specifically invested in the Target Retirement 2050 Fund complained of, below. He suffered further injury to his Plan account from the underperformance and excessive expense of this fund. In addition, Plaintiff Pitera suffered injury to his Plan account by having to pay for his share of consulting fees to maintain any of the lower performing or expensive funds in the Plan whether specifically identified herein or not, as described below. These funds were maintained and monitored with the assistance of Mercer Consulting who received at least $186,535 during 2020, the cost of which was borne by each participant in the Plan. Further, Plaintiff Pitera suffered injury to his Plan account by the fact that his claim against his share of investments in the Plan is diminished by the underperforming funds which were left languishing in the Plan whether they are

8

specifically identified herein or not. Under IRS regulations, a participant in any retirement plan regulated by ERISA, always maintains a claim in the form of an undivided interest against a plan's trust for his or her share of the investment. *See*, 26 CFR § 1.414(I)-1. The amount of this undivided interest is diminished for all participants when a plan is paying excessive fees and maintains expensive and/or underperforming funds, as alleged below. *Id*.

23.     Plaintiff, Sharon Bradley-Smith ("Bradley-Smith"), resides in Houston, Texas. During her employment, Plaintiff Bradley-Smith participated in the Plan investing in the options offered by the Plan. Plaintiff Bradley-Smith specifically invested in the Target Retirement 2020 through 2060 Funds complained of, below. She suffered further injury to her Plan account from the underperformance and excessive expense of these funds. In addition, Plaintiff Bradley-Smith suffered injury to her Plan account by having to pay for her share of consulting fees to maintain any of the lower performing or expensive funds in the Plan whether specifically identified herein or not, as described below. These funds were maintained and monitored with the assistance of Mercer Consulting who received at least $186,535 during 2020, the cost of which was borne by each participant in the Plan. Further, Plaintiff Bradley-Smith suffered injury to her Plan account by the fact that her claim against her share of investments in the Plan is diminished by the high recordkeeping and underperforming funds which were left languishing in the Plan whether they are specifically identified herein or not. Under IRS regulations, a participant in any retirement plan regulated by ERISA, always maintains a claim in the form of an undivided interest against a plan's trust for his or her share of the investment. *See*, 26 CFR § 1.414(I)-1. The amount of this undivided interest is diminished for all participants when a plan is paying excessive fees and maintains expensive and/or underperforming funds, as alleged below. *Id*.

24.     Plaintiff, Toranz J. Plummer ("Plummer"), resides in Fort Lauderdale, Florida. During his employment, Plaintiff Plummer participated in the Plan investing in the options offered by the Plan. Plaintiff Plummer specifically invested in the Target Retirement 2060 Fund

complained of, below. He suffered further injury to his Plan account from the underperformance and excessive expense of this fund. In addition, Plaintiff Plummer suffered injury to his Plan account by having to pay for his share of consulting fees to maintain any of the lower performing or expensive funds in the Plan whether specifically identified herein or not, as described below. These funds were maintained and monitored with the assistance of Mercer Consulting who received at least $186,535 during 2020, the cost of which was borne by each participant in the Plan. Further, Plaintiff Plummer suffered injury to his Plan account by the fact that his claim against his share of investments in the Plan is diminished by the high recordkeeping and underperforming funds which were left languishing in the Plan whether they are specifically identified herein or not. Under IRS regulations, a participant in any retirement plan regulated by ERISA, always maintains a claim in the form of an undivided interest against a plan's trust for his or her share of the investment. *See*, 26 CFR § 1.414(I)-1. The amount of this undivided interest is diminished for all participants when a plan is paying excessive fees and maintains expensive and/or underperforming funds, as alleged below. *Id*.

25.     Plaintiffs have standing to bring this action on behalf of the Plan because they participated in the Plan and were injured by Defendants' unlawful conduct.  In addition, Plaintiffs have standing because they suffered damage to their plan accounts by having to pay their share of the consulting fee charged by Mercer Consulting to maintain and manage the funds specifically identified below which have excessive expense ratios and which include, but are not limited to, those funds not specifically identified but which are used to pay for the excessive total plan costs. Further, in addition, Plaintiffs have standing because their claims against their share of investments in the Plan is diminished by the underperforming funds suffered by the Plan whether they are specifically identified herein or not as discussed above.  Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their

accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

26.     Plaintiffs did not have knowledge of all material facts (including, among other things, total cost comparisons to similarly-sized plans) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

**Company Defendant**

27.     Marmon is the sponsor of the Plan and a named fiduciary of the Plan with a principal place of business being 181 W. Madison Street, 26th Floor, Chicago, Illinois.  The December 31, 2020 Form 5500 of the Marmon Employees' Retirement Plan filed with the United States Department of Labor ("2020 Form 5500") at 1. Marmon describes itself as comprising "11 major business groups. These groups share expertise, knowledge and resources with and within each other, with a singular focus … ."[6] These 11 business groups are: medical, water, foodservice technologies, retail solutions, transportation products, rail and leasing, electrical, plumbing and refrigeration, metal services, industrial products and crane services. *Id.*

28.     Marmon appointed the Committee to, among other things, ensure that the investments available to the Plan's participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. The Marmon Health, Inc., Statement of Investment Policy, Effective August 24, 2020 ("IPS") at 3. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

---

[6] https://www.marmon.com/ last accessed on July 20, 2022.

29.    Accordingly, Marmon during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

30.    For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**Board Defendants**

31.    Marmon, acting through its Board, appointed the Committee to, among other things, ensure that the investments available to the Plan's participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. IPS at 3. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

32.    Accordingly, each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each had a duty to monitor the actions of the Committee.

33.    The Board and the unnamed members of the Board during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Board Defendants."

**Committee Defendants**

34.    A discussed above, Marmon and the Board appointed the Committee to, among other things, ensure that the investments available to the Plan's participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. IPS at 3. The IPS specifically provides that the Committee is charged with: "[e]stablishing and overseeing the investment options with the advice and assistance of the Investment Consultant." *Id.* The

Committee is further charged with "[r]eviewing reports and recommendation provided by the Investment Consultant on investment performance and the investment program and continuing appropriateness of each investment option." *Id.* The Committee must review and approve all actions of the Investment Consultant who is charged with: "[a]dvising the Committee on the design and establishment of an investment program for the Plans, including target date fund options, passive core options, active core options, and specialty options … ." *Id.* As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

35.     The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

36.     The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

**Additional John Doe Defendants**

37.     To the extent that there are additional officers, employees and/or contractors of Marmon who are/were fiduciaries of the Plan during the Class Period, or were hired as investment manager(s) for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserves the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, Marmon officers, employees and/or contractors who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## IV.  CLASS ACTION ALLEGATIONS[7]

38.    Plaintiffs brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[8]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between August 16, 2016 through the date of judgment (the "Class Period").

39.    The members of the Class are so numerous that joinder of all members is impractical.  The 2020 Form 5500 lists 13,667 Plan "participants with account balances as of the end of the plan year."  2020 Form 5500 at 2.

40.    Plaintiffs' claims are typical of the claims of the members of the Class.  Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated the Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

41.    There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

---

[7] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plan because class certification is not necessarily required for Plaintiffs to prosecute claims on behalf of the Plan and all participants.  *See, e.g.*, *In re: Wilmington Trust Corp.,* 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims).  ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

[8] Plaintiffs reserve the right to propose other or additional classes or subclasses in his motion for class certification or subsequent pleadings in this action.

    A.    Whether Defendants are/were fiduciaries of the Plan;

    B.    Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

    C.    Whether the Company and Board Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

    D.    The proper form of equitable and injunctive relief; and

    E.    The proper measure of monetary relief.

42.    Plaintiffs will fairly and adequately represent the Class and has retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

43.    This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

44.    In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V.     THE PLAN

45.     The Plan is a "defined contribution" plan within the meaning of ERISA Section 3(34), 29 U.S.C. §1002(34). The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. The 2020 Auditor Report at 5.   Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.  *Id.*

### *Eligibility*

46.     In general, regular full-time employees are eligible to participate in the Plan. 2020 Auditor Report at 5.

### *Contributions*

47.     There are several types of contributions that can be added to a participant's account, including: an employee salary deferral contribution, an employee Roth 401(k) contribution, an employee after-tax contribution, catch-up contributions for employees aged 50 and over, rollover contributions, discretionary profit-sharing contributions and employer matching contributions based on employee pre-tax, Roth 401(k), and employee after-tax contributions. *Id.*

48.     With regard to employee contributions to the Plan: "[e]ach participant may elect to contribute up to 85% of his or her eligible compensation to the Plan on a pre-tax (traditional) basis or on an after-tax (Roth) basis (both as salary deferral contributions)." *Id*. Marmon will make discretionary matching contributions to the Plan on behalf of its employees which are made "in the sole and absolute discretion of the Company's management in the form of profit-sharing contributions." *Id.*

16

49. Like other companies that sponsor a 401(k) plan for their employees, Marmon enjoys both direct and indirect benefits by providing matching contributions to the Plan's participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

50. Marmon also benefits in other ways from the Plan's matching program. It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See,* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

51. Given the size of the Plan, Marmon likely enjoyed a significant tax and cost savings from offering a match.

### Vesting

52. With regard to contributions made by participants to the Plan: [p]articipants are immediately 100 percent vested" in their salary deferral contributions. 2020 Auditor Report at 6. However, participants are subject to a five-year vesting schedule for contributions made by Marmon. *Id.*

### The Plan's Investments

53. In theory, the Committee determines the appropriateness of the Plan's investment offerings and monitors investment performance. IPS at 3. As will be discussed in more detail below, the Committee fell well short of these fiduciary goals.

54. Several funds were available to Plan participants for investment each year during the putative Class Period. Specifically, a participant may direct all contributions to selected investments as made available and determined by the Committee. *Id.*

55. The Plan's assets under management for all funds as of December 31, 2020 was $1,116,839,813.

*Payment of Plan Expenses*

56.     During the Class Period, administrative expenses were paid for using a combination of direct charges to participants and Plan assets. 2020 Auditor Report at 7.

## VI.     THE PLAN'S INVESTMENT PERFORMANCE DURING THE CLASS PERIOD WAS UNREASONABLE

### A. **The Totality of the Circumstances Demonstrates that the Plan's Fiduciaries Failed to Administer the Plan in a Prudent Manner**

57.     As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

58.     ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exist "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 142 S.Ct. at 741.

59.     Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing the Plan's investments because this information is solely within the possession of Defendants prior to discovery. *See, Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

60.     In fact, in an attempt to discover the details of the Plan's mismanagement, Plaintiffs wrote to the Defendants to request, among other things, the Committee's meeting minutes. This request was made on November 2, 2021. By letter dated December 2, 2021, Marmon denied the Plaintiffs' request for meeting minutes.

18

61.     Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process.  But in most cases, even that is not sufficient.  For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence.  Deliberative processes can vary in quality or can be followed in bad faith.  In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote et al. v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

62.     For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon several factors.

63.     As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries.  Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services…"  DOL 408(b)(2) Regulation Fact Sheet.

64.     "The duty to pay only reasonable fees for plan services and to act solely in the best interest of participants has been a key tenet of ERISA since its passage."  "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[9]

65.     Here, Defendants could not have engaged in a prudent process as it relates to the prudence of the Plan's funds.

**(A)     Defendants Breached Their Fiduciary Duties by Selecting and Retaining in the Plan's Lineup the Chronically Underperforming Internally Created Marmon Target Retirement Series of Target Date Funds**

---

[9] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain=false.

19

### 1.     The Use of Target Date Funds in 401(k) Plans

66.     Defendants caused the Plan to include in its menu of investment offerings the materially underperforming, internally created Marmon Target Retirement Series whose performance histories were less than mediocre when compared to their appropriate peer groups, benchmarks and market indexes.

67.     Target date funds are designed to provide a single diversified investment vehicle for plan participants. Target date funds are offered as a suite of funds, with each fund based on the participant's anticipated retirement date.

68.     The first target date funds in the industry were offered as early as 1994, and since then the market for target date funds has exploded with numerous investment managers offering a variety of different target date fund investments.

69.     By the mid-2000s, many target date funds with established performance histories were available to defined contribution plans. By 2009, several target date funds had performance histories of five years of more.

70.     Multiple types of assets are included in a target date fund portfolio, including equity (stock) and fixed income (bond) securities. Target date funds offer diversity and balanced exposure to a broad array of underlying securities included in the fund.

71.     An investment in a single target date fund can be attractive to plan participants who do not want to actively manage their retirement savings and periodically convert to more conservative holdings as their retirement date draws near. Target date funds automatically rebalance their portfolios to become more conservative as the participant gets closer to retirement.

72.     This rebalancing occurs based on the fund's "glide path." A glide path determines how the fund's target asset allocations across the underlying securities are expected to change over time and how they become more conservative as the target retirement date approaches.

73.     The target date refers to the participant's expected retirement year. For example, "target date 2030" funds are designed for individuals who intend to retire in 2030. As the year 2030 approaches, the fund's investment manager adjusts the underlying asset mix to become more conservative.

74.     Target date funds are divided into two broad categories based on the fund's glide path: "To" and "Through" target date funds. A "To" target date fund is designed to allocate its underlying assets to the most conservative investments at the year of the expected retirement. In contrast, a "Through" target date fund continues its glidepath progression to reach its most conservative asset allocation past the expected retirement date. This method focuses on the life expectancy of the participant rather than the retirement date.

75.     The Marmon Target Retirement Series in the Plan are "Through" funds.

76.     Regardless of the type of target date fund, the development of a target date fund's glide path and the corresponding asset allocations are important components of a target date fund. Constructing and maintaining a proper glide path and prudent asset allocation for target date funds is complex, time-consuming, and requires input from actuaries and other qualified investment professionals. For this reason, it's inexplicable that the Plan fiduciaries would have undertaken creating their own suite of target date funds when so many well established funds were available.

77.     Another broad classification of target date funds is "actively" or "passively" managed funds. With an actively managed fund, the portfolio manager attempts to select stocks or bonds to generate investment returns that exceed the relevant benchmark index return. With a passively managed fund, the portfolio manager attempts to mimic the performance of a relevant benchmark index. No discretion or research is needed for passive funds, in contrast to actively

managed funds. Because of this, passive or index funds charge a much lower investment management fee and have a lower total "expense ratio" relative to active funds.[10]

78.     For all target date funds, diversions from a determined glide path or significant changes in the underlying assets or asset allocations can have an extremely negative impact on wealth aggregation for investors. This impact can be particularly profound for participants in a 401(k) plan. It is well known in the investment industry that 401(k) participants rarely make trades in their 401(k) accounts. A fiduciary, held to the standard of an investment professional, therefore must ensure that an investment option added to a 401(k) plan's suite of investments remains prudent and in the best interest of plan participants.

79.     A fiduciary's duty to ensure that a prudent target date fund is offered to plan participants is heightened when considering the circumstances in which these funds are used by participants. Given the structure of target date funds, participants often invest all their retirement assets in a single target date fund that matches their retirement date. Some plans, like the Plan, make target date funds the default selection if plan participants do not select a specific fund within the 401(k) plan's lineup of investments. The use of a plan's target date funds as the default investment option underscores the importance of a prudent and diligent process of monitoring target date funds by plan fiduciaries.

80.     A fiduciary must monitor all investment options in a 401(k) plan as a prudent investment professional. This process includes a requirement for the fiduciary to regularly evaluate the fund's performance history, the portfolio manager's experience and tenure, changes to the fund's investment strategy, changes to the underlying assets in the investment, total assets under management within the fund, fees, and other relevant factors.

---

[10] The fees of mutual funds and similar investment alternatives are usually expressed as a percentage of assets under management, or "expense ratio." For example, if the fund deducts 1% of fund assets each year in fees, the fund's expense ratio would be 1%, or 100 basis points ("bps"). One basis point is equal to 1/100th of one percent.

81.     With respect to investment returns, diligent investment professionals monitor the performance of their selected target date funds using appropriate industry-recognized "benchmarks" and prudently managed equivalents.

82.     The measurement of target date funds against prudently managed alternatives is critical given that these alternatives represent other target date funds available to the plan, which may be a more appropriate choice to meet participants' retirement needs.

83.     Given the construction and composition of target date funds, diligent investment professionals must perform ongoing analyses and monitoring to ensure that the selected target date funds remains prudent options after their initial selection and insertion into the plan's suite of choices.

84.     During periods of underperformance, diligent investment professionals closely analyze the causes of the underperformance through attribution analyses. Causes or contributing factors are identified and analyzed.

85.     By 2010, multiple investment firms and banks offered target date funds with established and consistent performance histories, stable and experienced management, and discrete changes to the underlying assets and allocations.

86.     Established target date fund investment managers include, but are not limited to, American Funds, T.Rowe Price and Mutual of America. American Funds and T.Rowe have each offered target date funds for nearly 20 years with Mutual of America's offering being closer to 15 years and those target date funds have provided stable investment returns to 401(k) plan participants.

**(2)     The Marmon Target Retirement Series of Target Date Funds Chronically Underperformed**

87.     At all relevant times, Defendants maintained the authority to exercise control over the Plan's investments, including the Plan's target date fund investment options.

88.     At all relevant times during the Class Period, the Plan maintained the Marmon Target Retirement Series of target date funds.

89.     The Marmon Target Retirement Series are the only target date investing options in the Plan. In other words, participants in the Plan who want to invest in a target date strategy have no choice other than the Marmon Target Retirement Series.

90.     Defendants were under an obligation under ERISA to carefully vet the Marmon Target Retirement Series before selecting them for inclusion in the Plan. Defendants were also under a continuing obligation under ERISA to carefully monitor and scrutinize the performance of  on an ongoing basis thereafter.

**(a)     The Marmon Target Retirement Series Materially Underperformed Relative to Comparator Target Date Funds and Indexes**

91.     The Marmon Target Retirement Series consistently materially underperformed industry-accepted benchmarks for target date funds used by investment professionals.

92.      The Marmon Target Retirement Series can be compared to various similar target date funds ("Comparator Funds") and relevant indexes ("Comparator Indexes") as benchmarks. Suitable Comparator funds include the T.Rowe Price Retirement target date suite, the American Funds target date suite, the Mutual of America target date suite, the MFS Lifetime target date suite, Callan GlidePath target date suite and the Voya Target Solution target date suite. These six target date suites are suitable Comparator Funds to the Marmon Target Retirement Series because Morningstar, the most well respected and accepted financial industry fund database places all six of the Comparator Funds in the Morningstar Lifetime Moderate Index category as will be described in more detail below.

24

93.     A Morningstar Category is assigned by placing funds [*e.g.*, T.Rowe Price Retirement target date suite and the American Funds target date suite etc.] into peer groups based on their underlying holdings. The underlying securities in each portfolio are the primary factor in [Morningstar's] analysis . . . . Funds are placed in a category based on their portfolio statistics and compositions over the past three years. Analysis of performance and other indicative facts are also considered." *See* Morningstar's summary of the Northern Trust Focus 2045 Fund, filed in *Allegretti v. Walgreen Co. et al*., No. 19-cv-05392 at Dkt. 43 ECF pg. 28 (N.D. Ill. Dec. 6, 2019). The analysis in *Allegretti* similarly deals with the Morningstar Lifetime Moderate Index category. *Id.*

94.     Further, Morningstar states that it created its categories "to help investors make meaningful comparisons between mutual funds. Morningstar found that the investment objective listed on a fund's prospectus often did not adequately explain how the fund was actually invested." Morningstar Category Classification, 31 March 2022 ("Morningstar Classifier")[11] at page 5. The Morningstar Classifier goes on to state that "[f]or example, many funds claimed to be seeking "growth," but some of those were investing in established blue-chip companies while others were investing in small-cap companies." *Id.*

95.     Morningstar is the most well respected independent research tool available to the financial industry and is used and trusted by virtually all financial professionals and fiduciaries. Morningstar places the six Comparator Funds, and would place the Marmon Target Retirement Series, had it not been internally created, in the Lifetime Moderate Index category because the underlying holdings of each fund match the risk return profile of this category. As is demonstrated by the Morningstar graphs at Appendix "A," all six Comparator Funds concentrate their holdings

---

[11] Available at the following web address:
https://advisor.morningstar.com/Enterprise/VTC/MorningstarCategoryClassificationforFunds_April2022.pdf. Last accessed on May 12, 2023.

in the large blend risk/return category as do generally all target date funds. It's for this reason that the six Comparator Funds are accurate comparators as well as the more than 200[12] funds that Morningstar has placed in the Lifetime Moderate Index Category.

96. A prudent fiduciary should have used some or all of these benchmarks, or substantially similar benchmarks, to evaluate the performance of the Marmon Target Retirement Series as early as the inception of the Class Period, or sooner, and on an ongoing basis thereafter.

97. The performance of the Marmon Target Retirement Series lagged behind the performance of the applicable Comparator Funds for many years before the inception of the Class Period clearly showing that it was an imprudent choice for the Plan.

98. The yearly returns since the inception of the Marmon Target Retirement Series, shows that it was an imprudent selection when compared to its benchmarks and peers. It should be noted here that Marmon's own Investment Policy Statement requires that any fund included in the Plan have a meaningful performance history. As stated in its IPS: [f]und specific performance will be evaluated over trailing 3-year and 5-year periods on a net of fee basis." Under ERISA an IPS becomes part of the Plan Document and a failure to follow an IPS constitutes a breach of fiduciary duty. *Dardaganis v. Grace Capital, Inc.*, 889 F.2d 1237, 1241-42 (2d Cir. 1989) . Accordingly, it's inexplicable why the Plan fiduciaries would decide to create their own target date suite with no performance history as of August of 2017 with the first set full of returns only available on a yearly basis as of 2018. To make matters worse, the target date years 2025, 2035, 2045 and 2055 weren't created and added to the Plan until April of 2019.

---

[12] Each year, as funds are created or discontinued, the number of funds in this category varied but generally averaged slightly more than 200 funds. The list of funds in this Morningstar category in any given year, would include various share classes of each target date suite.

99.     Using 2018 as a sample year,[13] it's clear that out of more than 200 Morningstar peer funds in the Lifetime Moderate target date group, the Marmon Target Retirement Series was less than mediocre, at best. Here, at December 31, 2018, six target date series from this Morningstar peer group will be analyzed, namely the T.Rowe Price Retirement Tr-A target date suite, Mutual of America 2040 target date suite, the American Funds Target Retirement R6 target date suite and the MFS Lifetime I target date suite. At 2018, as demonstrated by the chart below, the six comparators were superior to the underperforming internally created Marmon Target Retirement Series.



---

[13] A similar analysis for 2019, 2020, 2021 and 2022 is attached hereto as Appendix "B."

100.     Clearly, the Plan fiduciaries decision to add internally created funds which had a less than three-year performance history, in violation of its own IPS was an error that cost Plan participants millions in lost retirement savings. In 2018, the Marmon Target Retirement Series significantly underperformed industry accepted benchmarks and should never have been selected for inclusion in the Plan, or, at the very least, should have been replaced very early in the Class Period. The Marmon Target Retirement Series consistently underperformed the OE Benchmark which is the Lifetime Moderate Index Category, discussed above, the OE Peer Group Median which is the median performance of all funds in the Lifetime Moderate Index Category and the SA Peer Group Median being funds that are considered separate accounts included in the Lifetime Moderate Index Category. Given these facts, it's not surprising that the Marmon Target Retirement Series significantly underperformed all six of the Comparator Funds.

101.     However, the six Comparator Funds are not the only funds that were significantly better than the Marmon Target Retirement Series. The 2018 performance of the Marmon Target Retirement Series can be compared to another underperforming target date series in the Lifetime Moderate Index Category namely the JPMCB SmartRetirement Pasv Blnd 2040-CF fund which had some of the worst fund rankings in its Morningstar Category, namely, the Target-Date 2040 Category whose funds make up the appropriate index, the Lifetime Moderate 2040 TR USD (ticker MSAAM40M).

102.     In 2018, JPMCB SmartRetirement Pasv Blend 2040 fund ranked in the 56th percentile out of 239 possible funds. In other words, there were 133 better performing funds in this category. But, yet, the return of the Marmon Target Retirement 2040 Fund was worse than even this underperforming fund. In 2018, the JPMCB SmartRetirement Pasv Blnd 2040-CF fund had a negative -7.97% return while the Marmon Target Retirement 2040 Fund had a return of negative -9.11%, as demonstrated in the chart above. Certainly given this fact, the Marmon Target Retirement 2040 Fund had one of the worst performance histories in its Morningstar category

demonstrating there would have been at least 140 better performing funds that could have been selected for the Plan.

103.    Clearly, it was a breach of fiduciary duty and imprudent for the Plan fiduciaries to have created and retained the Marmon Target Retirement series in the Plan. This is the case due to the difficulty in creating and maintaining a target date suite and the clear failure in performance as compared to its peers and industry benchmarks.

## FIRST CLAIM FOR RELIEF
### Breach of Fiduciary Duty of Prudence
### (Asserted against the Committee)

104.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

105.    At all relevant times, the Committee and its members during the Class Period ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

106.    As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).  These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

107.    The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. The Prudence Defendants selected and retained investment options in the Plan despite their severe underperformance compared to other comparable investments.

108.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to, *inter alia*, lower net investment returns.  Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

109.     Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

110.     The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.  Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**SECOND CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries**
**(Asserted against Marmon and the Board Defendants)**

111.     Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

112.     Marmon and the Board (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

113.     In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their

fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not fulfilling those duties.

114.    The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants.

115.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

(a)    Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee Defendants' imprudent actions and omissions;

(b)    failing to monitor the processes by which the Plan investments were evaluated, their failure to investigate the availability of lower-cost share classes; and

(c)    failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and Plan's participants' retirement savings.

116.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.   Had the Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

117.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee

Defendants. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A. A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B. Designation of Plaintiffs as a Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C. A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D. An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E. An order requiring the Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Defendants as necessary to effectuate said relief, and to prevent the Defendants' unjust enrichment;

F.     Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.     An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.     Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

I.     An award of pre-judgment interest;

J.     An award of costs pursuant to 29 U.S.C. § 1132(g);

K.     An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.     Such other and further relief as the Court deems equitable and just.

Date: October 27, 2023                    **CAPOZZI ADLER, P.C.**

*/s/ Donald R. Reavey*
Donald R. Reavey, Esquire
(*Admitted to General Bar ND ILL*)
PA Attorney ID #82498
2933 North Front Street
Harrisburg, PA 17110
Email: donr@capozziadler.com
Tel: (717) 233-4101
Fax: (717) 233-4103
Mark K. Gyandoh, Esquire
(*Admitted to General Bar ND ILL*)
PA Attorney ID # 88587
312 Old Lancaster Road
Merion Station, PA 19066
Email: markg@capozziadler.com
Tel: (610) 890-0200
Fax: (717) 233-4103

*Counsel for Plaintiffs and the Putative Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 27, 2023, a true and correct copy of the foregoing document was filed with the Court utilizing its ECF system, which will send notice of such filing to all counsel of record.


By: *<u>/s/ Mark K. Gyandoh</u>*